UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

_____

UNITED STATES OF AMERICA,

       Plaintiff,

 -vs-                        Case No. 19-CR-117-WMC

ADRIAN C. GARDINER,            Madison, Wisconsin
                               June 15, 2021
       Defendant.          1:14 p.m.

_____

STENOGRAPHIC TRANSCRIPT OF VIDEOCONFERENCE SENTENCING
HELD BEFORE U.S. DISTRICT JUDGE WILLIAM M. CONLEY

APPEARANCES:

For the Plaintiff:

              Office of the United States Attorney
              BY:  ELIZABETH ALTMAN
              Assistant United States Attorney
              222 West Washington Avenue, Suite 700
              Madison, Wisconsin  53703

For the Defendant:

              Tracey Wood & Associates
              BY:  JOSHUA HARGROVE
              1 South Pinckney Street
              Suite 950
              Madison, Wisconsin  53703

Also appearing:  ADRIAN C. GARDINER, Defendant
                 MARIAH STIEVE, U.S. Probation Officer

Jennifer L. Dobbratz, RMR, CRR, CRC
U.S. District Court Federal Reporter
United States District Court
120 North Henry Street, Rm. 410
Madison, Wisconsin  53703
(608) 261-5709

```
1              (Proceedings called to order at 1:14 p.m.)
2              THE CLERK:  Case No. 19-CR-117-WMC, United States of
3    America v. Adrian C. Gardiner, called for a sentencing.
4         May we have the appearances, please.
5              MS. ALTMAN:  Good afternoon, Your Honor.  The United
6    States appears by Elizabeth Altman.
7              MR. HARGROVE:  Good afternoon, Your Honor.  Mr.
8    Gardiner does appear via Zoom represented by counsel, Joshua
9    Hargrove.
10             THE COURT:  Very good.  We are here for the sentencing
11   of Adrian C. Gardiner, and I have to ask you, first, Mr.
12   Gardiner, to confirm that, despite improvements in COVID-19 in
13   Dane County, there continue to be risks in outlying counties and
14   obviously a risk until decided otherwise by health officials.
15   However, we are again meeting people in person in the courtroom
16   for other matters, and if you wished, we certainly would do so
17   again here and would bring you here to reassemble.  However,
18   there remain good grounds not to require that, assuming that you
19   continue to wish to waive your personal appearance at sentencing
20   as indicated by the waiver filed by your counsel on your behalf.
21        Does that continue to be your desire, that is, that we
22   proceed today by videoconferencing?
23             THE DEFENDANT:  Yes, Your Honor.
24             THE COURT:  All right.  And then, secondly, I do want
25   to confirm that you've had an opportunity to read and discuss
```

1    with your counsel the PSR and addendum to the PSR.

2             THE DEFENDANT:  Yes, Your Honor.

3             THE COURT:  I'll turn to the government just to confirm

4    that it is moving for an additional one-level reduction for

5    acceptance of responsibility.

6             MS. ALTMAN:  Yes, Your Honor.

7             THE COURT:  And that motion is granted.  I also note

8    that we appear to have at least -- well, I'm not certain who in

9    addition to the victim but perhaps the victim, who could be

10   shown in this call but initially I've chosen not to show her.

11   She has every right to participate, but I'm not sure what her

12   desires are, whether to simply watch or to actually address the

13   Court, and I'll turn to the government's counsel for some

14   guidance.

15            MS. ALTMAN:  Yes, Your Honor.

16       I know that Ms. Haynes-Porter, who is the victim's

17   grandmother, wishes to address the Court.  Ms. Paula Kedzie is

18   also on Zoom.  She submitted a letter to this court.  She is the

19   victim's social worker, and I don't know whether she wishes to

20   add something in person or not, but I know that the victim's

21   grandmother does.

22            THE COURT:  I certainly have Ms. Kedzie's thoughtful

23   memo and am taking it into consideration, but at the appropriate

24   time in the government's presentation, I will turn to you, Ms.

25   Altman, to indicate if the others wish to speak, at which point

1   anyone who asks to speak will then be displayed on the monitors.

2   In fairness, particularly given the harm done to the victim, I

3   want to make sure they understand that this is publicly

4   available to view.  I'm not sure how many viewers we actually

5   have, but this is a public proceeding, and because it's not

6   being held in court, it's available on YouTube to those who may

7   wish to respond.

8       I also note that Ms. Kedzie has just written that she would

9   like to speak as well, so at the appropriate time, we will have

10  both individuals speaking.

11      In the meantime, I do want to address a couple other

12  matters: first, restitution and where we stand and, secondly,

13  the guidelines.

14      Ms. Altman, can you advise me as to the status of the

15  restitution at this point?

16      MS. ALTMAN:  Yes, Your Honor.  We have mentioned

17  restitution to the victim's grandparent, who I believe right now

18  is her guardian.  We have not had time yet to have an in-depth

19  conversation about that and would request that the Court leave

20  it open.

21      THE COURT:  All right.  That's what I will do, and we

22  will have that hearing on August 20th, 2021, at 1:00 p.m.,

23  unless the parties are able to reach an understanding before

24  that time.

25      With those preliminaries, I will accept the plea agreement

1    finding that the offense of conviction adequately reflects the

2    defendant's criminal conduct and the plea agreement does not

3    undermine the statutory purposes of sentencing.  In determining

4    the defendant's sentence, I will take into consideration the

5    advisory sentencing guidelines and be governed by the statutory

6    purposes of sentencing set forth at Section 3553(a) of Title 18.

7         As to the guidelines, while the government had no

8    objection, the defendant did object to the application of the

9    specific offense characteristic at Sections 2G2.1(b)(6)(A) and

10   (B).  Although the Sentencing Commission has called on Congress

11   to change or remove this enhancement and, as defendant noted,

12   this court also routinely grants downward departures where this

13   enhancement might apply for reasons reflected in part E of the

14   presentence report, it remains in the guideline manual and is,

15   in the Court's view, appropriately applied in this case because,

16   one, the defendant used his cellular phone under subsection

17   (6)(A) to arrange for his travel to Wisconsin to engage in

18   sexual conduct with a minor rather than simply to hold -- I

19   shouldn't say simply, but to hold pornographic images, child

20   pornography, as is normally before the Court, and, two, the

21   enhancement is also applicable under subsection (b)(B) because

22   the defendant represented to the same minor that he was 18 years

23   old.

24        Moreover, while the defendant objected to Chapter Four --

25   the Chapter Four enhancement at paragraph 41 of the presentence

1  report, he did so by citing Section 4B1.5(a)(1) when the

2  applicable cite is to subsection (b)(1).  Under subsection

3  (b)(1), the defendant's relevant conduct establishes a pattern

4  of prohibited sexual conduct by repeatedly traveling to

5  Wisconsin to engage in sexual intercourse with Minor A, and

6  these events occurred -- the fact that these events occurred as

7  part of the instant offense involving the same victim, does not

8  result in additional criminal convictions, is not a relevant

9  factor as set forth in the applicable note, 4(B)(ii).

10      With those objections addressed, I, therefore, find the

11  probation office calculated the advisory guidelines correctly

12  using the current manual and taking into account all relevant

13  conduct under Section 1B1.3.

14      The guideline for production of child pornography in

15  violation of Section 2251(a) of Title 18 is found at Section

16  2G2.1.  The base offense level is 32 under subsection 2.1(a), to

17  which two levels are added under subsection 2.1(b)(1)(B) because

18  Minor A had attained the age of 12 years but not yet attained

19  the age of 16 years.

20      Two more levels are added under subsection 2.1(b)(2)(A)

21  because the offense involved the commission of a sexual act or

22  sexual contact.  Specifically, as noted already, the defendant

23  engaged in sexual intercourse with Minor A.

24      Another two levels apply under subsection 2.1(b)(3) because

25  the defendant knowingly created a video of Minor A and

1    distributed it to Minor A.

2         Two final levels are added under subsections 2.1(b)(6)(A)

3    and (b)(6)(B) because the defendant used a computer on an

4    interactive computer service to solicit Minor A's participation

5    in sexually explicit conduct and knowingly misrepresented his

6    own age to persuade, induce, entice, and coerce her to engage in

7    sexually explicit conduct.  More specifically, the defendant

8    used his cellular phone and various internet applications to

9    meet Minor A and arrange for his travel to Wisconsin for the

10   purpose of engaging in sexual contact with her while also

11   representing that he was 18 years old.

12        While no other Chapter Two adjustments apply, the offense

13   of conviction is a covered sex crime.  The defendant engaged in

14   a pattern involving prohibited sexual conduct.  The defendant

15   sexually assaulted Minor A on multiple separate occasions in the

16   summer of 2019, and neither Section 4B1.1 as a career offender

17   nor subsection (a) of Section 4B1.5 applies.  Therefore, the

18   defendant is considered a repeat dangerous child sex offender

19   whose offense level shall be V under Section 4B1.5(b)(1) plus

20   the offense level determined under Chapters Two and Three,

21   making the applicable offense level 45.

22        The defendant qualifies for a three-level downward

23   adjustment under Section 3E1.1 because he has demonstrated

24   acceptance of responsibility for his offense and the government

25   has moved for the additional reduction.

1        Accordingly, with a total offense level of 42 and a history
2    category of I, the defendant ordinarily would have an advisory
3    guideline imprisonment range of 360 months to life.  However,
4    the statutory authorized maximum sentence of 30 years is the
5    same as the minimum of the applicable guideline range, meaning
6    that the guideline term of imprisonment is 360 months under
7    Section 5G1.1(a).

8        I note that, in the defendant's memorandum, that emphasis
9    was placed on the fact that this defendant has no meaningful
10   criminal history, I think a total of one point before these
11   crimes, and that that should be a mitigating factor.  I am
12   willing to consider it.  However, I'm not sure I can get to the
13   sentence that either the defendant or, more inexplicably, the
14   government is recommending, and it's principally because of the
15   severity of the crimes that were committed.  The Court has
16   seldom had a defendant engage in more repeated horrendous
17   conduct at the age of 41.  I'm not even sure that's right.  When
18   it was committed, I guess he would have been 41.  To engage in
19   this kind of repeated conduct with a 12-year-old, no matter what
20   he told himself to begin with, and then to continue it when he
21   knew himself how young she was, to do so by thwarting her foster
22   parents for a clearly vulnerable victim, and to expose her to
23   others who also raped her, it's just a horrendous set of facts,
24   and at 41, now 42, I have a great deal of trouble not viewing
25   the defendant as a continuing danger to society.  The only

1   differences are what are pointed out by the defendant, fairly

2   so, that his criminal history is very small -- but under the

3   guidelines, that's already addressed by him being a category

4   I -- and the fact that he doesn't appear to have circulated the

5   videos that he made, which would further victimize this

6   individual.

7          I am certainly taking into consideration seriously the

8   agreement reached by the parties as to a recommended sentence,

9   but this does not strike me as a mandatory minimum case given

10  the egregious nature of the facts, and so I am struggling with

11  an appropriate sentence, and I'm happy to hear from the

12  government, although I've certainly read the memorandum

13  provided.  I'm not sure that the memorandum itself, except for

14  asking for the agreed-upon 20 years, doesn't make a pretty good

15  argument for why the Court should go above the mandatory

16  minimum.

17         And with that, I'll hear from the government.

18         MS. ALTMAN:  Your Honor, I don't have anything to add

19  to my arguments.  I would just ask that the Court listen to the

20  victims at this time, starting with Ms. Haynes-Porter, if the

21  Court would.

22         THE COURT:  The only thing -- I'm happy to do that, Ms.

23  Altman, but I am looking for something that would support your

24  repeated assertion in your memorandum that 20 years would avoid

25  unwarranted disparities and be sufficient but no greater than

1    necessary to accord with the purposes of sentencing.  I know you

2    agreed to make a recommendation of 20 years, but I can't think

3    of a case where I hadn't gone above the mandatory minimum for a

4    hands-on sexual assault of a minor.  Maybe the only difference

5    is this poor child was 12 instead of some of the more extreme

6    age differentials, but, I mean, I'm really having trouble

7    thinking of a case where someone was similarly situated where I

8    adopted the 20-year minimum.  And when you were making those

9    statements, were you thinking of some case or cases in

10   particular?

11          MS. ALTMAN:  Yes, Your Honor.  I had cited two cases in

12   my brief, the one with Mr. Kvatek, who was -- repeatedly

13   sexually assaulted a girl who was 15, although she was -- did it

14   more willfully, and then recently --

15          THE COURT:  And also, just so we're clear, I thought

16   that case involved -- was that a conviction for sexual assault

17   or was it for possession of child pornography?  What was he

18   allowed to plead to?

19          MS. ALTMAN:  I can double-check, Your Honor, quick

20   while you do the rest of the hearing.  It was either

21   distribution or production, one of the two.

22          THE COURT:  That's what I was thinking.  Well, that's

23   fine.  And then --

24          MS. ALTMAN:  The second case, Mr. Torres, he did plead

25   to production, and he had the two victims with the hands-on

1   contact, if you recall, and that was 20 years, and that was what

2   I was equivocating it toward because one of the victims in that

3   case was 7.

4           THE COURT:  And I'm trying to remember, there must have

5   been some other extenuating cases.  Was Mr. Ramirez [verbatim]

6   to be immediately deported?  There were other factors that

7   caused me to come down to that number, and I apologize because,

8   as you say, you did cite these, and I should have looked at them

9   before proceeding today, but if you can provide me any other

10  context with respect to that case as well, I would appreciate

11  it.

12         And with that said, I am happy to hear from the victim

13  representative as well as Ms. Kedzie, the lead social worker for

14  the victim.  Why don't we begin with the victim's grandmother,

15  and if she's comfortable, I would ask that she be put on the

16  screen.  It's totally up to you whether you want to be seen or

17  not.

18           MS. HAYNES-PORTER:  Your Honor --

19           THE COURT:  Yes.

20           MS. HAYNES-PORTER:  -- I would like to have access to

21  video.

22           THE COURT:  Very good.  And I can see you now as well.

23           MS. HAYNES-PORTER:  But now I can't see you.

24           THE COURT:  I wonder if perhaps you -- well, you

25  couldn't have hit your video, so I'm not sure why that would be.

```
1              MS. HAYNES-PORTER:  Okay.  Now I can.

2              THE COURT:  Is that better?

3              MS. HAYNES-PORTER:  Yes.  I can see you, Your Honor.

4              THE COURT:  Very good.  Why don't you proceed with any

5     statement you wish to make.

6              MS. HAYNES-PORTER:  Okay.  Good afternoon, everyone.

7              THE COURT:  Good afternoon.

8              MS. ALTMAN:  Good afternoon.

9              THE COURT:  Go ahead.

10             MS. HAYNES-PORTER:  I would like to talk to you about

11    the horrific and grotesque crime that Adrian Gardiner committed

12    against my granddaughter.  It has changed her life forever.  I

13    spend countless hours, days, and months trying to help my

14    granddaughter piece back together her very fragile life.  I have

15    been awakened from my sleep to the screams -- I'm sorry.

16             THE COURT:  No, no.  There's no need to apologize, and

17    I can only imagine the pain that you're experiencing with your

18    granddaughter.  Take your time, and I'm happy to hear anything

19    you wish to say.

20             MS. HAYNES-PORTER:  My granddaughter violently fights

21    in her sleep while sweating profusely.  I sometimes hold her in

22    my arms while trying to convince her that she's safe now,

23    reassure her that the monster -- that would be you, Mr.

24    Gardiner -- is not standing outside the window threatening to

25    kill us the way you did on that terrible night when she was at
```

1   another residence.  I watch her jump when we're driving if a car

2   gets too close to us.  I suffer a great deal when she says

3   certain males trigger her anxiety and make her have heinous

4   flashbacks of the way she was so viciously violated.  I'm sure

5   that this is not the first time you've done this.  You just got

6   caught this time.  I find myself making several trips throughout

7   my home at night checking my doors, checking my windows.  I'm

8   afraid to even retrieve my car from my garage because I'm

9   fearful that there may be someone just like you waiting to

10  ambush me.  You have successfully torn apart an entire family.

11       Your Honor, I hope that you sentence this man with the

12  maximum time allowed.  He does not deserve the privilege to be

13  released.  I beg of you, I implore you, please don't give him

14  the chance to ruin another child's life.  Hopefully you will

15  afford my family the opportunity to breathe a small sigh of

16  relief knowing that this man will hopefully die in jail.

17            THE COURT:  And I --

18            MS. HAYNES-PORTER:  Thank you, Your Honor.

19            THE COURT:  I can only tell you that I am certainly

20  considering the incredible damage that the defendant's acts

21  caused not just your granddaughter but her entire family,

22  including you.  As you know, the minimum sentence that I could

23  impose, which is being recommended by the parties, is 20 years,

24  so he's going to serve a lot of time, period, and he's going to

25  be under a 30-year period of supervision involving federal

1    probation officers, who take their job quite seriously,

2    especially when it comes to hands-on child sexual assault

3    defendants.

4        More importantly, I know that your granddaughter is

5    undergoing therapy, and I hope you don't give up on the value of

6    that.  It may take a long time, but she needs to get to the

7    right therapist, and she needs to be open with the right

8    therapist to process this over time.  I don't mean to suggest

9    for a moment she'll ever be the same person she was before, but

10   the progress that can be made by a good therapist to help a

11   child process this and move on with their life is pretty

12   remarkable.  So I hope you will constantly encourage her when

13   she is down, when she is having these experiences, to pursue

14   therapy, and if it's not working, then change therapists.

15   There's someone out there who can help your daughter [verbatim]

16   and, as importantly, can help you and the rest of your family,

17   and at some point therapy that includes you, if you're that

18   close with your granddaughter, as you obviously are, may help

19   you see ways to assist in the processing and not to trigger the

20   worse symptoms.

21       I know you love your granddaughter and that you're doing

22   everything you can.  The one thing you can't bring to the table

23   is the objectivity of a trained therapist, and so I just

24   encourage you -- this is the defendant's fault, all of this, but

25   it doesn't mean that he gets to have the last word as to the

1    damage done to your granddaughter or to your family, and I hope,
2    whatever the sentence is today, that this is the start of a
3    period of healing, understanding it could be very long and the
4    pain will always be there.
5         One thing I've learned -- I guess I knew this as a general
6    matter before taking this job, but after more than 11 years on
7    the job, I know the only way to really heal is to forgive, and
8    that's an impossible ask for the victim or for her family in a
9    case like this, but by God's grace, you may get there some day,
10   and I hope that you all do and that the defendant recedes into
11   the background of your lives rather than the prominence of it
12   right now.  I know it takes an awful lot of work to not just --
13   to even approach forgiveness.  It takes a lot of work just to
14   process what happened, but I hope that you and your family, and
15   particularly your granddaughter, are able to do just that.
16        Unless there's anything more you wish to add, I'm happy to
17   hear from Ms. Kedzie, the social worker who worked with your
18   granddaughter.
19             MS. HAYNES-PORTER:  Okay.  I'm done.  Thank you, Your
20   Honor.
21             THE COURT:  Thank you very much.  I greatly appreciate
22   you speaking today, and I guarantee you that it will be on my
23   mind in considering an appropriate sentence today.  Thank you.
24             MS. HAYNES-PORTER:  Thank you.
25             THE COURT:  Ms. Kedzie, I have read your memorandum.

1    It was very well written, and it did paint a picture of the ways

2    in which Mr. Gardiner made everyone's job harder and created the

3    nightmare that he did, particularly not just for the victim but

4    for the foster parents who were trying to protect her, but I'd

5    be happy to hear anything else that you wish to add.

6        MS. KEDZIE:  Sure, Your Honor.  First is Nevaeh, she

7    had wanted to attend this court hearing.  I met with her and

8    Guanita and another worker last week, and she wanted to attend.

9    She was calling family members, encouraging them to attend.  She

10   asked her mental health case manager if she and her mentor would

11   help her write a letter to Your Honor, and she's not here

12   because she's on the run.  You know, like the very next day she

13   ran away from her grandma -- well, she and her grandma got into

14   a fight, you know, over supervision, you know, and then she went

15   to one of our respite foster homes, you know, someone who has a

16   lot of experience dealing with, you know, teenagers with

17   difficult behaviors and mental health problems, and the next day

18   she ran away from there.  So that was about a week ago.  We

19   don't know where she is.  She's not in contact with her grandma,

20   with her mom, with any of us workers, sisters, aunts, uncles.

21   The word is that she, you know, she found someone, a man, to pay

22   her way to Chicago, you know.  That's what we've heard through

23   the grapevine.

24       The damage he's done to her is incalculable.  I can't

25   pronounce that word right now.

1        THE COURT:  You got it right.

2        MS. KEDZIE:  Okay.  What we also had in place is

3   in-home family therapy had just been starting.  She was going to

4   start horse therapy, which she was interested in.  A mentor from

5   a few years ago was back involved.  One of the very best

6   therapists here in Madison working with sexual abuse, Dawn

7   Brubakken, was going to be starting with her in July, and so we

8   really did have a good team developing, but she's been on the

9   run for a week, and that follows her being on the run for five

10  weeks prior, and this -- she wasn't a kid who ran away until she

11  was sexually assaulted by Mr. Gardiner.  She was -- she had

12  problems, don't get me wrong.  She lashed out at people

13  physically and made threats and didn't trust people, but this

14  behavior that started two years ago, you know, that was new, and

15  it started with the sexual assaults.  So I can't think of

16  anything else to add.

17       THE COURT:  I'm not sure there is anything more that

18  can be added.  I'm heartened to hear that you remain involved

19  and hope that she eventually reaches out to someone who cares

20  about her.

21       It may be, Ms. Haynes-Porter, that placement in some other

22  setting is going to be necessary for her initially.  I know that

23  a victim coordinator through the government's office is

24  available to assist as well.  If there's anything that we can do

25  at the court -- unfortunately, my principal task today is simply

sentencing, and it's a horribly blunt instrument.  It doesn't
change the harm that's been caused to the victim, and it doesn't
guarantee that the defendant or others like him will not engage
in similar conduct, but it's all I have, and I can assure you
that I am keeping in mind both your memorandum and your comments
today, and the victim will be -- and her family will be in my
prayers, and I hope that she does step forward.  I'm not sure
this hearing will have any value.  I don't think -- it's not
permitted to be recorded, but if there's anything I can do down
the line to assist, if we're lucky enough to get her back where
people care about her, I would certainly do that.  Thank you for
your comments today.

     At this point then I will hear from Mr. Hargrove.
Obviously, a lot has been said.  I certainly don't view you as
needing to respond to those who have spoken on behalf of the
victim other than perhaps if there's something you wish to say
regarding my comments or the government's comments, but you're
welcome to make whatever additional statement you want,
understanding that I have read with some care the memorandum
that you already filed.

     I'm not sure if you're speaking or not.  Your mic is muted.

          MR. HARGROVE:  Yes, Your Honor.  I can make a few
comments, and I won't reverberate everything that was written in
the PSR or in our sentencing memorandum, as the Court has made
it clear that it's reviewed everything carefully.

1    I can tell the Court that I do believe that the leading

2    aim, as has been thoroughly established in the sentencing, would

3    be punishment, and I do believe that at the far end of this, no

4    matter how long the Court incarcerates Mr. Gardiner, I also

5    believe that a secondary, even a diminished aim, would still be

6    rehabilitation for someone like Mr. Gardiner.

7         THE COURT:  And I certainly agree that's the goal, and,

8    fortunately, there are developing programs.  They're certainly

9    not there yet, but they're at least working hard to develop

10   meaningful programs for those who engage in hands-on sexual

11   offenses, and none of my comments were intended to indicate that

12   I didn't think it was possible for the defendant to be

13   rehabilitated.  It's just an area that we have very little

14   understanding of, and, fortunately, with careful supervision,

15   it's generally been managed for those who have served, but

16   there's obviously no guarantee since we don't really understand

17   the motivation behind the crime itself.

18        MR. HARGROVE:  And I completely agree with the Court.

19   I just wanted to state I believe and, as someone who has had a

20   number of conversations with Mr. Gardiner, I can tell the Court

21   unequivocally that while he may never in his life be able to

22   appreciate the impact and the devastation that he's caused her

23   and her family, he definitely has an overwhelming amount of

24   remorse, and he's taking responsibility for this, and I don't

25   just say that as rhetoric.  I say that because --

1          THE COURT:  And, Ms. Haynes-Porter, I would just ask --

2     you're welcome to stay on and be seen, but I wouldn't let

3     someone shake their head in the courtroom, and I would ask that

4     you not do that here.  I know what your response is to this.

5     You don't need to shake your head to tell me the anguish that

6     these comments are, but I hope you realize that Mr. Hargrove has

7     an obligation to represent his client and to make appropriate

8     statements.  If you find it difficult to maintain your

9     composure, which I understand, you can just do what has been

10    done by the social worker and simply remove the image.  If you

11    wish to do that, I would understand it.  But, otherwise, I do

12    have to ask you to at least not make demonstrations that are

13    distracting to my job, which is to hear from everyone.  Thank

14    you for that.

15         I'm sorry, Mr. Hargrove, for interrupting.  Go ahead.

16         MR. HARGROVE:  Oh, no need, Your Honor.

17         I think it's clear from all counts and no one contests that

18    this is an egregious case that's caused hurt all around, and I

19    completely can state that Mr. Gardiner is truly accepting

20    responsibility and accountability for his behavior.  I believe

21    his actions have caused hurt to everyone.  As I stated in the

22    sentencing memorandum, not only has it caused great devastation

23    to the victim and her family, everything she may have to

24    endeavor for the rest of her life, he did the same thing to his

25    own family because of his own behavior.  What his -- as I

1    stated, that he was the primary caretaker for his mother, who is

2    in her 70s, and she's had to do a number of things.  She's had

3    to have difficult conversations with people that's approached

4    her on the street, and it's affected his family as well.  So the

5    sad part about cases like this is it really devastates everyone,

6    and it really can't be understated how hurtful and harmful his

7    behavior is.

8        The uphill task is to ask the Court to also look at other

9    aspects of him, and that can be difficult in cases like this,

10   and I believe the Court stated it earlier at the genesis of the

11   hearing that it took into account the fact that he did not seek

12   or attempt to circulate any videos and that he did accept

13   responsibility, and I don't mean just by the plea.  I mean, just

14   as the PSR noted, when he had every incentive to try to deny how

15   he met her on this site or that he knew her or that he traveled

16   with her multiple times or even that he eventually became aware

17   of her age and subsequently still began to engage with her, he

18   admitted all of that, and I can say in my meager ten years of

19   practice, that's not a common practice when people are first

20   approached by law enforcement.  And as difficult as it is,

21   that's also another aspect of his character, that he took

22   responsibility even when it was disincentivized for him at that

23   point.  And even in the PSR it notes that it was in a jail call

24   where he told his mother what the issue was and that the victim

25   was 12 years old and he subsequently engaged in sexual

1    intercourse with her and -- sexually assaulted.  I want to state

2    it candidly because she's a minor.

3        And so I also want that before the Court, that this was not

4    someone, at least in this particular case, in this particular

5    instance, that was simply looking for minors.  The problem is

6    that once he knew, he did not stop, and that's what was

7    egregious.  That's what was harmful.  And as the Court noted, he

8    also was not honest about his age.  And so what I'm saying,

9    sentence him specific to his character, the fact that he comes

10   before the Court with a lack of criminal history, that he did

11   take responsibility, that he continues to take responsibility,

12   and that myself and the government have engaged in a number of

13   conversations, and so it doesn't come lightly that we're making

14   this recommendation to the Court.  We're taking into account the

15   effect and the fact that if after 20 years he is not able to

16   conform his conduct to the expectations of the law, he goes back

17   into incarceration.  And as I stated in the sentencing

18   memorandum, it's no small thing that he will most assuredly --

19   when he is released, the person who is his biggest supporter and

20   his biggest champion, his mother, will probably have passed

21   because she's in her mid-70s.  He won't see her again out of

22   custody.  He is now a felon, and he has a long time before him

23   to be in custody, and so I ask the Court to look at those

24   factors that are also punishment for him because of what he's

25   done when it's deciding what his sentence is.

```
 1          But it's for all of those reasons that I believe the
 2     government's sentence and what we're joining in is appropriate
 3     in this particular case.  Thank you.
 4          THE COURT:  Thank you, Mr. Hargrove.
 5          Before I hear from the defendant, I'm going to ask Ms.
 6     Altman to unmute and let me know if you were able to get any
 7     more details or context as to those other two cases.
 8          MS. ALTMAN:  No, Your Honor.  What I can tell you is
 9     that Mr. Torres was not about to be deported.  He was younger
10     than this defendant, and so perhaps that was the issue.  He was
11     in his early 20s.
12          But I would like to also clarify one thing --
13          THE COURT:  So, in other words, the age differential
14     wasn't as extreme as it is here.  Understood.
15          MS. ALTMAN:  The mandatory minimum for this case is 15
16     years, and in --
17          THE COURT:  I apologize.
18          MS. ALTMAN:  -- the sentencing memo, Mr. Hargrove
19     recommends 15 years.  We're recommending 20.  So I don't think
20     there is a joint recommendation, and we are not recommending the
21     mandatory minimum, and I just wanted to make sure --
22          THE COURT:  And I apologize for -- and I appreciate it,
23     and I should have noted --
24          MR. HARGROVE:  And that's correct, Your Honor.
25          THE COURT:  I should have noted the mandatory minimum
```

1    at the outset.  Thank you for that.  Thank you for that

2    clarification.

3              MS. ALTMAN:  Thank you, Your Honor.

4              THE COURT:  With that, I would be interested in

5    anything that you wish to say to the Court, Mr. Gardiner.

6              THE DEFENDANT:  I just want to apologize.  I just want

7    to apologize to the family that I affected.  I'm totally sorry.

8    I accept responsibility for what I did.  Once I would have known

9    her age, I should have stopped contact with her, and I take full

10   responsibility for my actions, and I apologize to everybody

11   involved.

12             THE COURT:  And I hope you understand that under the

13   Section 3553(a) factors, I do have to consider the harm that you

14   did to this victim but also your decision to continue even when

15   you knew the victim's age and even when you knew, and this is

16   almost as inexplicable as your proceeding when you knew her

17   actual age and sort of indicative of the fact that you must have

18   known from the beginning that there was something very wrong

19   here as a 41-year-old man to be in this kind of relationship at

20   all, but is the fact that even when you knew you were under

21   investigation, that the foster parents were trying to prevent

22   any further engagement, that you continued to cause this child

23   harm, and that I can't ignore that when thinking about an

24   appropriate sentence.

25             THE DEFENDANT:  I should have -- once I found out that

1     she was under the age of 18, I should have stopped all contact,

2     and I just apologize for my actions, and it was wrong.

3              THE COURT:  Age is one thing, but emotional immaturity

4     is another, and you victimized this young girl, whatever you

5     told yourself, and I have to consider that as well in thinking

6     about not just a sentence but the danger that you continue to

7     represent to society.  I'm hopeful that we'll make more progress

8     in understanding the motivations here, and I know that the

9     programming in the federal system has gotten better in that

10    regard.  Given your criminal history, I would think that you'll

11    probably be placed somewhere with programming for sexual

12    offenders, and I hope you don't make the mistake of thinking

13    that, "Well, I'm not like these other people," because you were

14    pulled into behavior that is just indefensible, and you need to

15    understand why you did what you did if you ever are going to

16    have hope of stopping yourself from similar conduct.  I hope you

17    take advantage of whatever therapy is provided.

18             Unless you wish to add anything more, I am prepared to

19    render sentence.

20             The defendant was raised in Chicago and Kansas City by his

21    parents.  Though he describes his childhood in positive terms

22    and reported his parents had a good relationship, the

23    defendant's brother describes their father as abusive and

24    suffering from addictions to heroin and alcohol.  The defendant

25    also suffered multiple challenging losses throughout his early

1   childhood, which exacerbated his own mental health concerns over

2   time.  Despite reported support of his family, the defendant

3   reported using alcohol to cope even before his arrest for the

4   instant offense, and I suspect that there are deep-seated issues

5   of denial for this defendant as to what he saw and experienced

6   and how he was raised himself that he will have to get to the

7   bottom of if he's ever going to dig his way out of this horrific

8   crime.  As for education, the defendant did not graduate high

9   school but reportedly went on to earn a GED at age 30.

10  Moreover, information about the defendant's employment history

11  is conflicting, providing no validated jobs, and his brother

12  reported long-standing concerns for the defendant, indicating

13  that he struggled to find stability in life.  It was noted that

14  the defendant seemed to be helping his grandmother, but that too

15  is hard to quantify.

16       As for the offense of conviction, in the summer of 2019,

17  the defendant met a 12-year-old female foster child online and

18  communicated with her through various internet applications for

19  several months portraying himself to be 18 years old with three

20  foster siblings.  The defendant communicated with the victim

21  often and would travel to Wisconsin on numerous occasions to

22  pick her up and transport her to parks and motels for the

23  purpose of engaging in sexual intercourse.  On several occasions

24  the defendant also provided her with alcohol and refused to

25  return her home when she requested.  On one occasion the

1     defendant even brought three purported foster brothers with him,

2     and those three also proceeded to have sexual intercourse with

3     the child, apparently prompting the defendant to abandon her at

4     the motel.  The defendant further filmed his sexual encounters

5     with the 12-year-old and sent one of the videos to her iPad, the

6     purposes of which are both devastating and deeply concerning.

7     Finally, despite learning the child was 12 years old and knowing

8     law enforcement was aware of his illegal acts, the defendant

9     persisted in contacting the victim and arranging additional

10    meetings to have sex with her despite her foster parents' best

11    efforts to prevent further sexual assaults.

12         Taking into consideration the nature of the offense as well

13    as the defendant's personal history and characteristics, I am

14    persuaded that a custodial sentence somewhere between the

15    20-year sentence recommended by the government and the 30-year

16    maximum is reasonable and no greater than necessary to hold the

17    defendant accountable, protect the community, provide the

18    defendant the opportunity for rehabilitative programs, and

19    achieve parity with sentences of similarly situated offenders

20    who engage in sexual relationships with young children, record

21    those encounters, and then distribute their illicit sexual

22    encounters, albeit hopefully only to the victim.  It is also

23    intended to underscore that such individuals are dangerous sex

24    offenders to minors and the need for our society to do better.

25         As to Count 1 of the indictment, it is adjudged that the

1    defendant is committed to the custody of the Bureau of Prisons

2    for a term of 300 months, in other words, 25 years.  During the

3    period of incarceration, I recommend that the defendant receive

4    sex offender treatment; substance abuse treatment, including

5    RDAP; a mental health evaluation and recommended treatment; and

6    be afforded prerelease placement in a residential re-entry

7    center with work release privileges.

8        Although the defendant is in primary federal custody, he

9    has a pending charge in Sauk County, Wisconsin, Circuit Court

10   Case No. 20-CF-466.  Under the Supreme Court's ruling in *Setser*

11   *v. United States*, I have the discretion to impose a sentence

12   that will run concurrently with or consecutively to any other

13   sentence but will stand silent on the pending state case

14   believing that the state judge is in the best position to decide

15   if incremental punishment is appropriate in light of the

16   sentence I imposed today.

17       The defendant's term of imprisonment is to be followed by a

18   30-year term of supervised release.  He will be subject to the

19   statutory mandatory conditions of supervision.  In light of the

20   nature of the offense and the defendant's personal history, I

21   adopt Condition Nos. 1 through 25 as proposed and justified in

22   the presentence report, noting that neither party has raised any

23   objections to those proposals and that they will fulfill the

24   goals of the Sentencing Reform Act.  Specifically, as already

25   noted, the defendant's conduct, involving multiple trips from

1    Indiana to Wisconsin during the summer of 2019 to have sexual

2    intercourse with a 12-year-old female at parks and hotels after

3    meeting and communicating with her online as well as him

4    recording some of their sexual encounters and sending it to the

5    child victim's iPad, demonstrate the substantial need for close

6    supervision upon his release from custody, especially his

7    persisting in that conduct even after learning the victim was 12

8    years of age and law enforcement was involved.

9        Acknowledging that the defendant's criminal history is

10   limited to the one conviction for illegal transport of a firearm

11   and one allegation of battery to a prisoner while detained, his

12   education and employment history could not be verified, and his

13   history of alcohol use to cope with diagnosed mental health

14   conditions underscore something that he did not address with

15   ongoing mental health treatment and never received substance

16   abuse treatment demonstrate how crucial close supervision and

17   assistance with education, job placement, alcohol and mental

18   health treatment, and stable housing will be to his successful

19   transition to a law-abiding life upon release.

20       In addition, the instant offense, although not drug

21   related, mandatory drug testing as set forth in Section 3583(d)

22   of Title 18 for supervision cases is not waived based on his

23   history of marijuana and hallucinogens use as addressed in

24   Condition No. 17.

25       As counsel is aware, the Seventh Circuit has continued to

1    leave open the possibility that this court should enter on the

2    record each of the conditions verbatim and then justify them

3    individually, and I'm happy to do so, unless the defense wishes

4    to waive that recitation.

5        And I'm hoping we still have Mr. Hargrove, although I

6    cannot quite see him on the screen.  The question, Mr. Hargrove,

7    is whether my justifications for the conditions of supervision

8    are adequate or whether you want me to enter each of the

9    conditions verbatim on the record and justify them individually,

10   which I will --

11       MR. HARGROVE:  I heard the Court.  I believe the

12   Court's colloquy thus far is adequate.  I can answer any

13   subsequent questions from my client.

14       THE COURT:  Well, let me make sure, do you have any

15   questions about the conditions that were set forth in the

16   presentence report at this time, Mr. Gardiner?

17       THE DEFENDANT:  No, sir.  No, Your Honor.

18       THE COURT:  All right.  I am afraid I am going to ask

19   that you formally waive my going through each condition and

20   justifying each of them, although I will incorporate that from

21   the presentence report into my justifications today.  Unless

22   it's formally waived, I'll have to do that, which I will do.

23   I'm not opposed to doing it, but it would have to be something

24   you formally waive.  Is that your desire?

25       MR. HARGROVE:  Not without having a breakout with Mr.

1    Gardiner if the Court wants a formal waiver.

2            THE COURT:  Then I'm afraid that, as I read the Seventh

3    Circuit case law, that's what we'll need to do.  I'm not -- I

4    want to be clear:  I'm not requiring you to waive it, and I have

5    the conditions in front of me, and I'm happy to walk through

6    each of them and justify them individually, understanding there

7    are 25 set forth in the presentence report in some detail and

8    that I would justify each of them.

9        If you want to break out for that discussion, go ahead.

10           MR. HARGROVE:  Yes, very briefly.  It will only take a

11   minute or two.  If I can just have a breakout.

12           THE COURT:  Sure.  We will do that.  Very good.

13       And, Mr. Gardiner, you'll be passed into a separate room as

14   well in a moment.  I hope.  And why don't we go off the record

15   at this time.

16           (Discussion held off the record.)

17           THE COURT:  With that said, we'll go back on the record

18   at this time, I believe.

19           THE CLERK:  No.  I think he just finally went into the

20   room.

21           THE COURT:  Okay.

22       (Pause in proceedings from 2:12 p.m. until 2:14 p.m.)

23           THE COURT:  All right.  We'll go back on the record.  I

24   think we might have --

25           THE CLERK:  We're still waiting for --

```
1            THE COURT:  -- lost defense counsel for a moment, but
2     we're back on the record.  As soon as we have Mr. Hargrove, you
3     can address the Court.  I hope we get him back.  There we are.
4            MR. HARGROVE:  Yes.  I apologize, Your Honor.
5            THE COURT:  We're back on the record.  Sorry.  Go
6     ahead.  We're back on the record.
7            MR. HARGROVE:  Forgive me.  I didn't mean to cut off
8     the Court.
9         I did speak with my client, and I believe we are fine
10    waiving the reading of those conditions in court today.
11           THE COURT:  And is that correct, Mr. Gardiner?
12           THE DEFENDANT:  (Muted).
13           THE COURT:  You have your mute on.  I don't know if
14    that was intentional or not.  Hopefully you can -- yes, there
15    you go.
16           THE DEFENDANT:  Yes, Your Honor.
17           THE COURT:  Okay.  Very good.
18        With that said, I do want to emphasize for Mr. Gardiner,
19    since this will be a very long time, that you appreciate any
20    condition I've imposed today may no longer be appropriate when
21    you're released.  If that's the case, you should work with your
22    probation officer to reach agreement on amendments that will
23    have to be brought back to the Court, whether it's to me or some
24    other federal judge who would consider the merits of it.  Even
25    if the probation officer doesn't agree, you can petition the
```

1    Court for amendments at the time of your release.

2         It is adjudged the defendant is to pay a $100 criminal

3    assessment penalty to the Clerk of Court for the Western

4    District of Wisconsin, which is required by statute and

5    immediately due following sentencing.  I do encourage the

6    defendant to make that payment if possible.  If not, then at

7    least to do the check off so that he is not precluded from any

8    programming as a result while confined in the federal prison

9    system.

10        The victim in this case has not yet made a specific request

11   for restitution.  However, as noted in the plea agreement, the

12   defendant has agreed to pay restitution, and so by request of

13   the government's counsel, I have set over for a restitution

14   hearing on August 20th of this year at 1:00 p.m. consideration

15   of an appropriate restitution amount in addition to any other

16   criminal penalties, restitution, or special assessment

17   authorized by law the Court is directed to assess while not more

18   than $17,000 for any person convicted of an offense under

19   Section 2252(a)(4) of Title 18 or Section 2252A(a)(5) and not

20   more than $35,000 for any person convicted of any other offense

21   for trafficking in child pornography; finally, not more than

22   $50,000 for any person convicted of child pornography production

23   offenses.  The Court will consider factors under Section 3553(a)

24   and Section 3572 both of Title 18 when ordering this assessment,

25   but I will defer as to the amount consistent with the request of

1    the parties.  The defendant is -- well, I'm just going to defer

2    on that.

3        I do find at this point that the defendant lacks the

4    economic resources to allow him to make full payment of

5    restitution in the foreseeable future, so I will set a nominal

6    payment to begin 30 days from his release from custody at the

7    appropriate time.

8        The defendant is to notify the United States Attorney

9    General and this court of any material change in his economic

10   circumstances that might affect his ability to pay restitution.

11       Finally, in addition to whatever restitution is ordered, I

12   find that the defendant would lack the means to pay a further

13   fine under Section 5E1.2(c) without impairing his ability to

14   support himself upon release from custody.

15       And a final order of forfeiture will be granted for the

16   property seized from the defendant as reflected in the

17   forfeiture order in accordance with Section 2253 of Title 18.

18       Based on the offense of conviction, the defendant is

19   required to pay a $5,000 assessment under the Justice for

20   Victims of Trafficking Act of 2015 unless indigent.  However, I

21   again find that he is indigent, and this assessment is waived.

22       The probation office is to notify local law enforcement

23   agencies and the state attorney general of the defendant's

24   release back to the community.

25       In the event that the parties do reach agreement on

1    restitution, I will, under Section 3664(f)(3)(B), require the

2    defendant to at least begin making nominal payments of a minimum

3    of $100 each month beginning within 30 days of his release.

4        With that said, I understand that there are additional

5    counts to be dismissed at this time under the plea agreement?

6            MS. ALTMAN:  Yes, Your Honor, and I would so move.

7            THE COURT:  Those counts, I believe, 2 through 4, but,

8    regardless, the remaining counts against this defendant are

9    dismissed.

10       I will ask, Mr. Hargrove, for you to confirm that I've

11   sufficiently addressed the defendant's main arguments in

12   mitigation today.

13           MR. HARGROVE:  Yes.

14           THE COURT:  Then, finally, I want to emphasize for you,

15   Mr. Gardiner, you have a right to appeal this court's sentence.

16   It is -- it has not been arrived at lightly, but in addition to

17   your plea, you can challenge the sentence by filing a notice of

18   appeal.  You only have 14 days to do that, so you should discuss

19   it with Mr. Hargrove, who I'm confident would assist you in

20   filing the notice, although someone else may be appointed to

21   represent you on appeal.

22       With that, I can only say that I realize this sentence is

23   not going to be satisfying to the victim or her family nor

24   obviously to the defendant, but I've tried to weigh the harm

25   done and the requirements of the statute in sentencing and also

1    hope that the defendant is able to gain insights as to how he

2    managed to justify in his own mind the conduct for which he has

3    now been sentenced.

4         With that said, I believe we are in recess, unless there's

5    something more for the government?

6              MS. ALTMAN:  Nothing, Your Honor.  Thank you.

7              THE COURT:  Or for the defendant.

8              MR. HARGROVE:  Just, Your Honor -- I might have missed

9    it -- do we need to establish credit?

10             THE COURT:  Normally that's done by the Bureau of

11   Prisons itself.

12             MR. HARGROVE:  Okay.

13             THE COURT:  Assuming he was in custody, which I believe

14   he was, federal custody while held, all of that would be applied

15   against his federal sentence.  The only portion that would not

16   be applied would be if he were to have been held at some point

17   in state custody and an actual sentence is imposed in this case.

18        Officer Stieve, for the benefit of the defendant, do you

19   know roughly how much credit he'll have against his sentence?

20             OFFICER STIEVE:  I don't, Your Honor, only that he's

21   been in federal custody.

22             THE COURT:  All right.  Mr. Hargrove, you're welcome to

23   come back to the Court if there's a problem with the calculation

24   by the Bureau of Prisons, but typically they're pretty receptive

25   to an award of full credit.  Given that the defendant has 25

1    years ahead of him, there will, sadly, be plenty of time to

2    address that if not.

3         With that said, I am going to recess, and I do hope, Mr.

4    Gardiner, you're able to find some semblance of understanding

5    and grace in your future.  We are in recess.

6              MS. ALTMAN:  Thank you.

7              THE CLERK:  This court stands in recess.

8         (Proceedings concluded at 2:23 p.m.)

9                              ***

38

1          I, JENNIFER L. DOBBRATZ, Certified Realtime and Merit

2     Reporter in and for the State of Wisconsin, certify that the

3     foregoing is a true and accurate record of the proceedings held

4     on the 15th day of June, 2021, before the Honorable

5     William M. Conley, U.S. District Judge for the Western District

6     of Wisconsin, in my presence and reduced to writing in

7     accordance with my stenographic notes made at said time and

8     place.

9          Dated this 28th day of October, 2021.

10

11

12

13

14

15                              _____/s/ Jennifer L. Dobbratz_____

16                              Jennifer L. Dobbratz, RMR, CRR, CRC
                                     Federal Court Reporter
17

18

19

20

21

22

23

24    The foregoing certification of this transcript does not apply to
      any reproduction of the same by any means unless under the
25    direct control and/or direction of the certifying reporter.